UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| NADINE HEMMINGHAUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:11CV736 CDP |
| | ) | |
| STATE OF MISSOURI and | ) | |
| GARY GAERTNER, JR., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Nadine Hemminghaus began working as a court reporter in

Missouri state court in 1997.  She was terminated in 2009.  She alleges that her

supervisor, Judge Gary Gaertner, Jr., terminated her in violation of her First

Amendment rights because she criticized the police and prosecutor for not

prosecuting a former nanny for abusing her children.  She also alleges that her

requests for time off to care for her children following the abuse were denied, in

violation of the Family Leave and Medical Act.  I conclude that defendants are

entitled to summary judgment.  Hemminghaus was not covered by the FMLA

because, under the particular employment arrangements for official division court

reporters in the Missouri Circuit Courts, she qualified as non-covered personal

staff of an elected official.  Judge Gaertner is entitled to qualified immunity on the First Amendment claims, and her claims for equitable relief are moot.

## I.    <u>Summary Judgment Standard</u>

In deciding whether to grant summary judgment, I must view the facts and any inferences from those facts in the light most favorable to the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  The movant bears the burden of establishing that: (1) there are no genuine issues of material fact, and (2) it is entitled to judgment as a matter of law.  Rule 56, Fed. R. Civ. P.; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  Once the movant has met this burden, however, the non-moving party may not rest on the allegations in its pleadings but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material act exists.  Fed. R. Civ. P. 56(e).

## II.   <u>Background</u>[1]

Hemminghaus began working as an official "swing" court reporter in the Circuit Court of St. Louis County in 1997.  As a swing reporter, she was assigned to a different judge's division each week.  At that time, the director of judicial administration supervised all the swing reporters.  In 2005, Circuit Judge David Vincent appointed her to be the official reporter for his division.  The following year, Hemminghaus applied for an opening in defendant Gaertner's division.  In

---

[1] The facts stated here are either uncontested or are stated in the light favorable to Hemminghaus.

October 2006, Gaertner appointed Hemminghaus as the official court reporter for his division.

As Gaertner's official court reporter, Hemminghaus was responsible making a verbatim record of everything that occurred on the record in his court.  In exchange, she earned a salary and benefits that were paid by the State of Missouri. Hemminghaus was supervised directly by Gaertner, and she worked in his division along with his court clerk and bailiff.  Gaertner sometimes allowed her to work from home and sometimes allowed her time off, but Hemminghaus never took leave without asking Gaertner ahead of time.

In September 2008, Hemminghaus discovered that her two young sons had been abused by their nanny.  The nanny admitted to police that she had slapped the children.  Later, the children began making disclosures about sexual abuse, and they developed significant behavioral problems, including anxiety and severe tantrums.  Hemminghaus was critical of how the police and prosecutors were investigating her children's abuse.  She eventually learned that the prosecutor's office had declined to press charges against the nanny.

In December 2008, an assistant county prosecutor called Gaertner to tell him Hemminghaus' former nanny had contacted the police to complain that Hemminghaus had been harassing her with telephone calls.  The assistant prosecutor also told Gaertner that Hemminghaus had almost been arrested and had

been escorted from the police department after she had gone there to demand that the police take action on her children's abuse case.

Gaertner then called a meeting with Hemminghaus.  He asked Gail Crane, a senior probate division employee, to mediate.  At that meeting, which took place December 2, 2008, Hemminghaus asked Gaertner for permission to talk to the media about her children's case.  Hemminghaus believed that the nanny was a danger to society and that the prosecuting attorney was not doing his job.  According to Hemminghaus' testimony, Gaertner told her not to go to the media or she would be fired.

But Hemminghaus had already spoken to a local reporter by that time.  She continued her contact with the reporter after the December meeting and also emailed the host of a national television show to criticize the police and the prosecutor's office, and she expressed concern that the nanny could potentially harm other children.  She  engaged other court employees in conversations about the case.  She blogged several hundred times about her children's abuse on a parental support website, as well as on a site hosted by a local media outlet.  Though she occasionally mentioned her familiarity or employment with the justice system, she blogged anonymously.

That same month, the nanny filed an *ex parte* order of protection against Hemminghaus, but the nanny voluntarily dismissed it 12 days later.

– 4 –

Between December 2008 and April 2009, Hemminghaus continued working as Gaertner's official court reporter.  According to her testimony, she made numerous requests for leave to take care of her children during that period, but Gaertner denied or ignored most of her requests.

On April 27, 2009, Hemminghaus spoke to Gaertner on the telephone and asked for time off that morning to care for her son.  At first, Gaertner acquiesced to her request.  Later, he called back and told Hemminghaus she needed to come to work because there was something on the record.  After she arrived at work, Hemminghaus and Gaertner had two conversations.  In her answers to interrogatories, Hemminghaus described those interactions this way:

> I again spoke with [Gaertner] after I had gotten to work [on April 27, 2009] and he came into my office and asked how my son was doing.  I asked him if he really wanted to know.  I told him I was on the phone with the doctor that morning discussing health-related issues and told him what those issues were – that my children had further revelations of abuse.  I also told him that I was going to continue to pursue a case against the babysitter and he told me not to bring these issues up to anyone in the courthouse.
>
> Later that day, we again spoke in [Gaertner's] chambers.  I asked him once again for time off in the mornings for my sons and, once again, the conversation switched to my pursuit of the babysitter.  I told him I intended to pursue a case against her.  He said, No one will ever look at your case, period.  The PA won't take it, the US Attorney won't take, no one will take it.  He said that no one believes children your kids' age.  I asked him not to hurt me or my case and I would not hurt him by having to tell people what he was doing to me by telling me I couldn't pursue a case against the babysitter.  I then said, Will Dateline hear my case?  At that, he jumped up and ran out from behind his desk, and started screaming, Get out of here now and never

come back in here again! On my way out, I said, if you're going to
fire me, just do it because I can't take this anymore.

(Pl.'s Ex. 1, Answers to Interrogs., ¶ 10, p. 10.)  The next day, April 28, 2009,

Crane knocked on Hemminghaus' office door and told her Gaertner wanted to

have another meeting.  Hemminghaus believed at the time that Gaertner was going

to fire her, so she arranged to have her attorney on speakerphone when she came to

Gaertner's chambers.[2]  When Hemminghaus announced that her attorney was on

speakerphone, Gaertner hung up the phone.  Hemminghaus stated that she refused

to be unrepresented during the meeting, so she left and returned to her office.

After that, Gaertner spoke with several court employees and family members, and

ultimately decided to terminate Hemminghaus' employment.

　　　According to his testimony, Gaertner would not have fired Hemminghaus if

she had remained in his office after he hung up on her attorney.  Gaertner stated:

> . . . having any third person involved in the [April 28] conversation
> totally vitiated my ability to supervise Ms. Hemminghaus. . . . if Ms.
> Hemminghaus had sat there and stayed in the room after I had
> terminated the conversation with [her attorney], I don't think we
> would have ever gone down the path of terminating her on that day.
> I'm about a hundred percent certain. . . .  But when she refused to talk
> to me without [her attorney] present, it just – the working – working
> situation between me and Ms. Hemminghaus was irreparably harmed
> at that point in time.

---

[2] The parties now agree that Gartner did not intend to fire her, but instead intended to advise
Hemminghaus about new requirements for her employment: (1) that she was not permitted to
talk to him or other court personnel about her children's abuse case; (2) that she had to be
working at the court 8:45 a.m. to 5 p.m. every weekday, rather than working from home; (3) that
she had to leave her office door open while she was working; and (4) that she could take family
leave in order to resolve her issues.

(Pl.'s Ex. 9, Gaertner Dep. 206:9–20.)

The next day Gaertner signed an Employee Information form showing that Hemminghaus had been dismissed for "Unsatisfactory job performance & conduct and behavior."  (Pl.'s Ex. 16, p. 3.)  He also wrote a termination letter to Hemminghaus.  In that letter, he wrote that Hemminghaus had "engaged in unprofessional conduct while at work," failed to arrive at work on time, and "caused several serious disruptions" within his division.  Gaertner also wrote that he had spoken with Hemminghaus about these issues, but her performance had not improved.  He wrote that her refusal to stay at the April 28 meeting without her attorney had "irretrievably broken" their working relationship and that it "necessitate[d] the immediate termination" of her employment.  (Def.'s Ex. 5, p. 1.)

## III.    **FMLA Claim**

Hemminghaus alleges that the State of Missouri – through its agent Gaertner – violated her FMLA rights by either denying her leave to care for her children or retaliating against her for taking such leave.  In their summary judgment motion, defendants first argue that Hemminghaus was not eligible for FMLA leave for a variety of reasons.  They argue that Gaertner, not the state, was her employer, and he did not have the necessary 50 employees.  They also argue that she was not covered by FMLA because she was personal staff of an elected official.

Defendants also contend that Hemminghaus' children did not have a "serious health condition" as required to trigger her right to FMLA leave, and more fundamentally, that the FMLA does not protect Hemminghaus' right to the specific type of "unscheduled and unpredictable" leave she sought.

The FMLA was intended to "balance the demands of the workplace with the needs of families." 29 U.S.C. § 2601(b)(1); *see also Caldwell v. Holland of Texas, Inc.*, 208 F.3d 671, 676 (8th Cir. 2000). To effectuate this intent, the FMLA authorizes eligible employees to take up to twelve workweeks of unpaid leave per year for certain reasons. Among other things, employees can use such leave to care for themselves or immediate family members suffering from a "serious health condition." 29 U.S.C. § 2612(a)(1)(C).

The FMLA covers eligible employees in both the private and public sectors. *Id.* § 2611(4)(A); *see also Darby v. Bratch*, 287 F.3d 673, 681 (8th Cir. 2002). The Act defines a "public agency" to include "the government of a State or political subdivision thereof," as well as any agency of a State or its political subdivision. 29 U.S.C. § 203(x) (incorporated by *id.* § 2611). Like her private-sector counterpart, a public employee is only eligible for FMLA leave if the public agency for which she works employs at least 50 people. *See* 29 C.F.R. § 825.108(d).

– 8 –

Even if a public employee meets this requirement, however, she is not necessarily covered by the FMLA.  The Act excludes public-agency employees who were "selected by the holder of [a public elective office] to be a member of his personal staff."  29 U.S.C. § 203(e)(2)(C)(ii)(II).[3]

## A.   *Hemminghaus' Employer was the State of Missouri*

Defendants first argue that Hemminghaus' "employer," for purposes of FMLA coverage, was Gaertner rather than the State of Missouri.  As such, they contend, she does not meet the requirements for FMLA eligibility because Gaertner employed fewer than 50 people.  This argument has no merit.

Hemminghaus' salary was not only paid by the State but set statutorily by the Missouri legislature.  *See* Mo. Rev. Stat. §§ 485.060, 485.065.  Her life insurance, health insurance, and retirement benefits were paid by the State. Moreover, the Missouri Court of Appeals has held decisively that "a Court Reporter is an 'employee of the state.'"  *Hawkins v. Mo. State Employees' Ret. Sys.*, 487 S.W.2d 580, 583 (Mo. Ct. App. 1972) (holding that as employees of the state, court reporters are entitled to participate in the state retirement system).

In addition, federal regulations interpreting the FMLA provide that:

---

[3]   An employee who falls under the personal-staff exception also must not be "subject to the civil service laws of the State, political subdivision, or agency" that employs her.  *Id.* § 203(e)(2)(C)(i).  An at-will state employee is not subject to the state's civil service laws, *e.g., Austin v. Cook Cnty.*, No. 07CV3184, 2011 WL 5872836, at *5 (N.D. Ill. Nov. 16, 2011), and the parties agree that Hemminghaus was an at-will employee.

> A State or a political subdivision of a State constitutes a single public agency and, therefore, a single employer for purposes of determining employee eligibility. For example, a State is a single employer; a county is a single employer; a city or town is a single employer. Whether two agencies of the same State or local government constitute the same public agency can only be determined on a case-by-case basis. One factor that would support a conclusion that two agencies are separate is whether they are treated separately for statistical purposes in the Census of Governments issued by the Bureau of the Census, U.S. Department of Commerce.

29 C.F.R. § 825.108(c)(1) (2009).  *See also Fain v. Wayne Cnty. Aud.'s Office*, 388 F.3d 257, 259–60 (7th Cir. 2004) (interpreting prior version of regulation); *Rollins v. Wilson Cnty. Gov't*, 154 F.3d 626, 629–30 (6th Cir. 1998) (under the prior version, courts should examine state law first and only use the Census of Governments if ambiguity remains).

Here, the Census of Governments' classification of the State as a single employer – rather than recognizing individual circuit judges as employers – also supports the conclusion that Hemminghaus was employed by the State.  *See, e.g.,* "Expenditure Functions," U.S. Census Bureau, *Gov't Fin. & Employment Classification Manual* (2006 edition), p. 152 (including court reporters as a "general government" expenditure of the "judicial and legal" functions of State governments); "Missouri," *Individual State Descriptions: 2007* (reissued November 2012), pp. 176–82 (not listing courts or judges as separate entities from the State).  *See also Hawkins*, 487 S.W.2d at 582 (Missouri circuit judges are themselves state employees).

State law and the classifications of the 2007 Census of Governments and federal regulations demonstrate that Hemminghaus' employer was the State of Missouri.  Because the State employs more than 50 people, Hemminghaus meets the numerosity requirement for FMLA eligibility.

**B.**     ***Hemminghaus Was "Personal Staff" of A "Public Elective Office Holder"***

Although I agree with Hemminghaus that her employer was the State, I still must consider defendants' argument that she cannot bring an FMLA claim because she is excluded from the statute's coverage as personal staff of a public elective office holder.  *See* 29 U.S.C. § 2611(3) (incorporating by reference *id.* § 203(e)).  There are two questions presented:  whether Gaertner was a "public elective office holder" and whether Hemminghaus was part of his "personal staff."  I conclude that the answer is yes to both questions.

**a.**     **"Public Elective Office Holder"**

Whether a judge appointed under the Missouri Nonpartisan Court Plan is a "public elective office holder" for purposes of the FMLA is an issue of first impression.  Despite the hybrid nature of Gaertner's selection as circuit judge, I conclude that he was an elective office holder because he was subject to removal by the electorate.

The Missouri Plan provides a multistep process for the selection of certain state judges, including the circuit judges of St. Louis County.  MO. CONST. ART. V,

– 11 –

§ 25(a)–(g).  First, when a judicial vacancy arises at one of the covered state

courts, interested candidates may apply.  Next, a nonpartisan judicial commission,

comprising five members, nominates three finalists from among the applicants.  *Id.*

§ 25(d).  The commission submits those three names to the governor, who selects

one of them to fill the vacancy.  The newly appointed judge takes office and

becomes subject to periodic, nonpartisan retention elections.  For example, circuit

court judges stand for such retention elections every six years.  *Id.* § 19.  In order

to appear on the ballot at all, the judge must declare his or her candidacy.  *Id.* §

25(c)(1).  The ballot language concerning a judge's retention or removal is

prescribed in the Missouri Constitution and simply asks the yes or no question:

"Shall Judge [name] of the [particular court] be retained in office?"  *Id.*  If a

majority of voters vote "no," the judge is removed at the end of his or her term.

Otherwise, the judge goes on to serve another term.

As stated above, whether a Circuit Judge appointed and subject to retention

elections under the Missouri Plan is an elective official for purposes of the FMLA

has not been decided.  Some courts have touched on the issue when considering

whether such judges are "elected" for purposes of other federal statutes.  For

example, in a suit under the Age Discrimination in Employment Act a district

judge noted in a footnote that judges were not "elected" for purposes of that

statute, but went on to decide that they could not bring an ADEA claim anyway

– 12 –

because they were "appointee[s] at the policymaking level." *Gregory v. Ashcroft,*

No. 4:88CV0221, 1989 WL 208396, at *2 (E.D. Mo. July 14, 1989).  In affirming

the decision, both the Eighth Circuit and the United States Supreme Court found it

unnecessary to decide whether the judges were "elected" because they agreed they

were excluded under the appointee language.  *See Gregory v. Ashcroft*, 501 U.S.

452, 467 (1991), *affirming* 898 F.2d 598, 600 (8th Cir. 1990).  The Eighth Circuit

again found it unnecessary to decide whether judges selected under the Missouri

Plan were "elected to public office" for Title VII purposes in *Goodwin v. Circuit*

*Ct. of St. Louis Cnty., Mo*., 729 F.2d 541, 549 n.10 (8th Cir. 1984).   Earlier, in

*Marafino v. St. Louis Cnty. Cir. Ct*., 537 F. Supp. 206, 211 (E.D. Mo. 1982) , the

district court had assumed without deciding that a Missouri circuit court judge is

"elected" for purposes of Title VII.

Despite these somewhat conflicting statements, there is no doubt that a

retention election under the Missouri Plan is an "election":

> Retention elections are opportunities for the electorate to choose to
> retain a person as a judge. While a retention election does not place
> one person in electoral conflict with another, as in partisan elections,
> it is nonetheless an election. One serves at the will of the people in
> either event.

*African-Am. Voting Rights Legal Def. Fund*, 994 F. Supp. 1105, 1122 (E.D. Mo.

1997) (Voting Rights Act case), *aff'd per curiam*, 133 F.3d 921 (8th Cir. 1998);

*see also Bradley v. Ind. State Elect. Bd.*, 797 F. Supp. 694, 697 (S.D. Ind. 1992)

(retention elections of Indiana state judges were "elections" under Voting Rights Act).

Vulnerability to ouster by the public is the very essence of an elective office. Though Missouri Plan judges may be appointed at the outset, they continue to serve only at the will of the people; they must face an election to retain their positions. As such, Missouri Plan judges are "elective office holders" for purposes of the FMLA.

**b.    "Personal Staff Member"**

The next question then is whether Hemminghaus was excluded from FMLA coverage as a member of Gaertner's personal staff. I conclude that Hemminghaus was a member of Gaertner's personal staff because she served at his pleasure, was accountable only to him, was closely supervised by him, and because Hemminghaus and Gaertner worked together, with interdependent duties, in the same small division.

An individual who serves as a member of an elected official's "personal staff" is not eligible for FMLA leave.[4] *See* 29 U.S.C. § 2611(3) (incorporating by reference *id.* § 203(e)). Determining whether an employee falls within the personal-staff exception is a "highly factual" inquiry to be construed narrowly

---

[4] The FMLA explicitly incorporates the FLSA's personal staff exception in 29 U.S.C. § 2611(3)). It is therefore appropriate to consider cases applying the same exceptions found in the FLSA in deciding this issue. *See, e.g.*, *Rutland v. Pepper*, 404 F.3d 921, 923 (5th Cir. 2005).

against the employer.  *Rutland v. Pepper,* 404 F.3d 921, 924 (5th Cir. 2005); *see also Teneyuca v. Bexar Cnty.*, 767 F.2d 148, 152 (5th Cir. 1985); *Baker v. Stone Cnty., Mo.*, 41 F. Supp. 2d 965, 983–87 (W.D. Mo. 1999) (examining the FLSA personal-staff exception); *Perry v. City of Country Club Hills*, 607 F. Supp. 771, 774 (E.D. Mo. 1983) (legislative history of Title VII personal-staff exception expressly demonstrates Congress' intent for it to be construed narrowly).  The relevant facts concerning Hemminghaus' job duties and conditions are not disputed.  Because the dispute is strictly about how the law applies to the undisputed facts, this issue is appropriate for summary judgment.

The uncontroverted evidence makes clear that Hemminghaus occupied the kind of highly accountable and closely supervised position exempted by the statute.  Hemminghaus held her office "during the pleasure of the judge" who appointed her.  Mo. Rev. Stat. § 485.040.  Gaertner had the sole and final say over the decision to hire her as his official reporter, and he had the sole and final say over the decision to fire her.  During her tenure in his division, no one other than Gaertner ever acted as Hemminghaus' supervisor, and she reported directly to Gaertner rather than to an intermediary.  Hemminghaus testified that she never took leave without checking with Gaertner first, and that she never had someone else fill in for her without talking to Gaertner ahead of time.  Both her hours and her duties were dictated by Gaertner.  In short, the record makes clear that he

supervised Hemminghaus closely, had frequent, if not daily, contact with her, intervened in interoffice disputes, and relied heavily upon her to effectuate the business of the court.  The nature of their working relationship demonstrates that Hemminghaus was a member of Gaertner's personal staff.

It is not Hemminghaus' title that excludes her from the FMLA, but rather the circumstances of her working relationship with Gaertner.  *Compare Curl v. Reavis*, 740 F.2d 1323, 1328 (4th Cir. 1984) (under Title VII, deputy sheriff was not elected sheriff's personal staff in part because deputy was not personally supervised by sheriff), *with Owens v. Rush*, 654 F.2d 1370, 1376 (10th Cir. 1981) (under Title VII, deputy sheriff was elected sheriff's personal staff in part because deputy admitted he had a "very close working relationship with the sheriff"). Although not all court reporters – or even all official court reporters – may necessarily be excluded from FMLA coverage, it is clear that Hemminghaus was. *See Gunaca v. State of Texas*, 65 F.3d 467, 468–69 (5th Cir. 1995) (investigator working for district attorney was exempt personal staff where district attorney closely supervised his work on a daily basis and relied heavily on his work, plaintiff was accountable only to the district attorney, and they shared a small office space); *Wall v. Coleman*, 393 F. Supp. 826, 831 (S.D. Ga. 1975) (assistant district attorney was personal staff under Title VII in part because assistant only worked for one particular district attorney, not all county district attorneys); *Birch*

– 16 –

*v. Cuyahoga Cnty. Probate Court*, 392 F.3d 151, 158–59 (6th Cir. 2004)
(magistrate was presiding probate judge's personal staff under Title VII in part
because magistrate reported directly to judge and magistrate's duties were "heavily
interdependent" with those of judge); *Baker*, 41 F. Supp. 2d at 987 (plaintiffs, who
were deputy sheriffs, dispatchers and jailers, were not sheriff's personal staff
because sheriff did not attend to day-to-day supervision of their office; schedule
their work shifts; take their grievances; make adjustments to their schedules; or set
meetings to discuss official office policy; and plaintiffs were not part of sheriff's
command staff and may not have contact with him for weeks at a time).

Hemminghaus's reliance on opinion letters from the Department of Labor's
Wage and Hour Division, which conclude that court reporters do not fall under the
personal-staff exception of the FLSA, is misplaced.  Those letters[5] are merely the
Wage and Hour Division's opinion about how certain court decisions should be
interpreted.  Their authors did not consider the facts of *this* case, and this court is
not bound to follow the opinion letters.  In light of my own interpretation of the
case law, I do not find them particularly helpful.

Because Gaertner held an elective office and Hemminghaus was a member
of Gaertner's personal staff, she was not eligible for FMLA leave.  Therefore,
defendants are entitled to summary judgment on her FMLA claim.

---

[5] Opinion Letters, Dep't of Labor, Wage & Hour Div., 1998 WL 1147737 (Nov. 27, 1998) &
2005 WL 3308594 (Aug. 26, 2005), 2005 letter *reprinted as* Pl.'s Ex. 42.

– 17 –

## IV.    First Amendment Retaliatory Discharge Claim

In her remaining claim, Hemminghaus alleges defendant Gaertner
discharged her because she spoke to media, colleagues, and others about her
children's abuse and publicly criticized the prosecutor's office and the police
department.  She contends that her speech was protected by the First Amendment,
and that Gaertner violated her First Amendment rights by terminating her
employment.  She has sued Gaertner in his individual capacity as well as his
official capacity.   I conclude that Gaertner is entitled to qualified immunity on her
claim against him in his individual capacity, and her claim against him in his
official capacity is moot.

### A.    *Qualified Immunity*

A public official, sued in his individual capacity, is entitled to qualified
immunity if his conduct "does not violate clearly established statutory or
constitutional rights of which a reasonable person would have known."  *Bartlett v.
Fisher*, 972 F.2d 911, 914 (8th Cir. 1992) (quoting *Harlow v. Fitzgerald*, 457 U.S.
800, 818 (1982)).  To determine whether qualified immunity is warranted in a
retaliatory discharge case, a court applies a two-prong test: (1) whether the plaintiff
has alleged violation of a constitutional right and (2) whether that right was
"clearly established" at the time of discharge.  *Sexton v. Martin*, 210 F.3d 905, 910

– 18 –

(8th Cir. 2000); *see also Pearson v. Callahan*, 555 U.S. 223 (2009) (courts have discretion to address these two prongs in any order).

Hemminghaus has alleged that Gaertner violated her constitutional rights by firing her in retaliation for exercising her First Amendment right to free speech. But this assertion alone does not settle whether her speech warranted protection under the First Amendment nor whether her right to speak was "clearly established."  Each of these inquiries is to be resolved by the court as a matter of law.  *Fales v. Garst*, 235 F.3d 1122, 1123 (8th Cir. 2000) (per curiam).

In light of concrete evidence showing Hemminghaus' speech impaired working relationships, and in light of Gaertner's interest in impartiality and preserving public confidence in the courts, I conclude that Hemminghaus' right to speak was not clearly established and Gaertner is entitled to qualified immunity for firing her.

a.     **Public Concern**

Speech by public employees is entitled to some measure of First Amendment protection.  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).  In order to determine whether a public employee's speech merits protection, the court first inquires whether the employee spoke as a citizen on "a matter of public concern." *Fales*, 235 F.3d at 1123 (quotation marks omitted).  If so, the court goes on to determine whether the employee's interest in speaking outweighs her employer's

interest in "promoting the efficiency of the public service it performs through its employees." *Lindsey v. City of Orrick*, 491 F.3d 892, 900 (8th Cir. 2007) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).  To merit protection, a public employee's speech must meet each of these requirements.

Gaertner first argues that Hemminghaus' speech was not of public concern because it related only to her "private interest" in the prosecution of her children's abuser.  This argument ignores uncontroverted evidence showing Hemminghaus continued to speak out about child abuse and prosecutorial discretion after she knew the nanny would not be prosecuted in her children's case.  (*See* Gaertner Dep., 114:4–18; Defs.' Ex. 20.)  In addition, even if Hemminghaus' speech was purely self-interested, Gaertner's contention that such speech is always unprotected contradicts established precedent in this circuit.  *See Calvit v. Minneapolis Public Schools*, 122 F.3d 1112, 1114 (8th Cir. 1997) (school employee's criticism of child abuse reporting policy was matter of public concern even if speech was motivated by self-interest); *Belk v. City of Eldon*, 228 F.3d 872, 880 (8th Cir. 2000) (speech made for "personal motives" may be protected if "the speech itself addresses matters of public concern"); *see also McGee v. Public Water Supply*, 471 F.3d 918, 921 (8th Cir. 2006).   In light of the record and the case law, I conclude that Hemminghaus' speech related to a matter of public concern.

b.      *Pickering* **Balancing Test**

This determination does not fully resolve whether Hemminghaus' speech was entitled to First Amendment protection.  To settle that question, I would normally turn to the *Pickering* balancing test.  391 U.S. at 568.  However, before *Pickering* can be put at issue at all, a public employer must put forth evidence that the speech in question had an adverse impact on the efficiency of the employer's operations.  *See Lindsey*, 491 F.3d at 900.  In other words, to trigger *Pickering*, the employer must show "with specificity" that the employee's speech created workplace disharmony, impeded the employee's performance, or impaired working relationships.  *Id.*

In *Lindsey*, the Eighth Circuit held that a mayor's conclusory statements that the employee's speech had an "adverse effect" on working relationships and "undermined" City Council authority were insufficient to trigger the *Pickering* test. 491 F.3d at 901.  In support of its contention that *Pickering* should be applied, the mayor offered her own testimony that the employee had argued with the Council and the mayor.  The Eighth Circuit concluded that this "scant evidence" did not show impaired working relationships or actual disruption of any kind.  *Id.* at 900. Therefore, *Pickering* did not apply, and the mayor was not entitled to qualified immunity for firing the employee.

Here, unlike *Lindsey*, the defendants have put forth specific evidence demonstrating that Hemminghaus' speech disrupted the workplace.  Two of Hemminghaus' colleagues testified in depositions about her speech.  Probate employee Kim Nakashima-Moran called Gaertner on two separate occasions to tell him Hemminghaus' speech made her uncomfortable.  Senior probate employee Gail Crane testified that Hemminghaus had made a remark about Gaertner that she considered threatening.  Hemminghaus herself testified that she believed Gaertner was responsible for hindering the prosecution of her children's case.  Most tellingly, assistant prosecutor John Evans, a frequent litigant and officer of the court, called Gaertner to alert him that some of Hemminghaus' speech was harassing, had caused her to be escorted from the police department, and almost caused her to be arrested.  Together, these statements constitute concrete evidence that Hemminghaus' speech caused actual disruption of working relationships within and outside of Gaertner's division.  *See Fales*, 235 F.3d at 1124 (defendant school showed workplace disharmony and negative impact on efficient administration where teacher's speech about special education issues led to confrontations with colleagues, factions among faculty, and hiring of outside mediator).  I conclude that Gaertner has made the threshold evidentiary showing required to put the *Pickering* balance at issue.

Once at issue, the *Pickering* balancing test goes to both prongs of the qualified immunity inquiry: not only whether a public employee's speech is entitled to First Amendment protection, but whether that right has been clearly established.  This is because *Pickering* is so fact-intensive that rights involving its application have only rarely been "clearly established" for purposes of qualified immunity.  *Bartlett*, 972 F.2d at 916.

Considering the complexity of *Pickering*'s balancing test in this particular case, I conclude that regardless of whether all of Hemminghaus' abundant speech was protected under *Pickering*, her right to engage in such speech was not clearly established at the time she was fired.  Given her position as court reporter and the weight of Gaertner's interest in impartiality and public confidence in the courts, it was reasonable for Gaertner to be concerned about the potential conflict of interest that Hemminghaus' criticisms of the prosecutor may have created.  *See McDaniel v. Woodard*, 886 F.2d 311, 317 (11th Cir. 1989) (state judge entitled to immunity for firing secretary who helped district attorney investigate case on behalf of her son in part because "the importance of keeping the judicial office separate from prosecutorial functions was far-reaching and crucial"); *Fabiano v. Hopkins*, 352 F.3d 447, 448–51 (1st Cir. 2003) (supervisors entitled to immunity for firing city employee who had filed suit against city zoning board in part because their concern about the potential conflict of interest was reasonable); *Wersal v. Sexton*, 674 F.3d

1010, 1021 (8th Cir. banc 2012) (upholding clause in Minnesota's judicial conduct code in part because state has compelling interests in preserving impartiality and preserving the appearance of impartiality).

In sum, the undisputed evidence does not show that, by firing Hemminghaus, Gaertner violated any of her clearly established statutory or constitutional rights. Therefore, he is entitled to qualified immunity as to Hemminghaus' § 1983 claim for damages against him in his individual capacity.

## B.   *Official Capacity Claim*

As I stated before, Hemminghaus has sued Gaertner in his official capacity, as well as his individual capacity, for First Amendment retaliation. Because an official-capacity suit is treated as an action against the State, a state officer is not entitled to qualified immunity when sued in his official capacity. *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999). In addition, money damages and other retrospective relief are not available in an official-capacity suit, but prospective injunctive relief may be. *Serna v. Goodno*, 567 F.3d 944, 952 (8th Cir. 2009).

Here, Hemminghaus has not sufficiently described what relief she would like from Gaertner in his official capacity. In her amended complaint, the only specific injunctive relief she requests is reinstatement. (Am. Compl., pp. 6–7.) However, Hemminghaus testified in her deposition that that she does not wish to

work in Missouri, that she did not think she was able to work at all at that point, and that there "would be no way on earth" she would take a job with Gaertner. (Hemminghaus Dep. 273:17–276:15.)  In addition, as she acknowledges, Gaertner is no longer a circuit judge, so he would not be able to rehire her in the same position.  She also testified that there were no jobs available and she "wouldn't want to take somebody else's position." (*Id.* 275:15–16.)  Given Hemminghaus' testimony and Gaertner's elevation to the Missouri appellate court, it appears that Hemminghaus does not seek any injunctive relief whatsoever.  She has renounced the injunctive relief she once sought, so her official-capacity claim is moot. *See Beck v. Mo. State High Sch. Activities Ass'n*, 18 F.3d 604, 605 (8th Cir. 1994) (per curiam); *see also Medina v. Columbus State Cmty. Coll.*, 2:08CV154, 2009 WL 2524619, at *3 (S.D. Ohio Aug. 18, 2009) (where prospective student sued for admission to dental program but then rejected it when offered, case was moot). To the extent that she does still seek injunctive relief, there is none I could grant that would effectively redress her alleged injury. *See Beck*, 18 F.3d at 605; *see also Glister v. Primebank*, 10CV4084 MWB, 2012 WL 3518507, at *32 (N.D. Iowa Aug. 14, 2012) (dismissing as moot plaintiff's employment discrimination claim, where plaintiff sought policy and training changes, because there was no evidence plaintiff would ever work for that employer again).  Therefore, Hemminghaus' official-capacity claim is dismissed as moot.

– 25 –

## V.   Conclusion

Hemminghaus was not eligible for FMLA leave because she was a member of Gaertner's personal staff, so defendants are entitled to summary judgment on her FMLA claim.

In addition, Gaertner is entitled to qualified immunity on Hemminghaus' First Amendment retaliation claim against him in his individual capacity. Hemminghaus' official-capacity suit is moot because she has disavowed her interest in reinstatement and no other form of injunctive relief would effectively redress her alleged injury.  Therefore, defendants are also entitled to summary judgment on Hemminghaus' First Amendment claims.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment [#69] is granted.

**IT IS FURTHER ORDERED** that:

Defendants' motion to strike the 2006-2007 audio recordings produced by plaintiff [#55] is denied as moot.

Defendants' motion to strike testimony of plaintiff's designated medical expert witnesses [#68] is denied as moot.

Plaintiff's motion to strike reply to response to motion [#84] is denied as moot.

**IT IS FINALLY ORDERED** that the portion of my order dated January 11, 2013 [#89] stating that I will schedule a telephone conference for the purpose of selecting a new trial date is vacated.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 13th day of February, 2013.